**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF ARKANSAS**
**FAYETTEVILLE DIVISION**

**SHEILA MCCOY, Individually and on**
**Behalf of All Others Similarly Situated**                    **PLAINTIFF**

**VS.**                              **NO.  5:20-cv-5176 PKH**

**ELKHART PRODUCTS CORPORATION**                    **DEFENDANT**

**BRIEF IN SUPPORT OF MOTION TO DECERTIFY COLLECTIVE ACTION**

**INTRODUCTION**

This FLSA case was conditionally certified as a collective action based on allegations all hourly production employees were subject to a common policy of "shaving hours"[1] that violated the law.  We have 66 current opt-in Plaintiffs, of which 17 have been deposed. Discovery has revealed this allegation is not true and the case should be decertified.  This is not an improper "rounding" case, but a "long punch" case. Defendant does not shave hours, as alleged.  Instead, Plaintiffs have testified that until around September 2020, the company allowed hourly employees to clock in at any time during the 15 minutes before they are to begin work at the start of their shift or 15 minutes after the work stops at the end of their shift. This gave employees the ability to clock in or out without having to stand in line at the time clocks (although some apparently do before the end of their shift in a rush to leave as close to 3:30 pm as possible). It was widely communicated and understood, however, that employees are not to begin work until their shift starts and to stop by shift end, as signified by a buzzer in Fayetteville and a clock in Westville.

That policy and practice is expressly allowed by the regulations implementing the FLSA. *See* 29 C.F.R. Section 785.48(a) ("In those cases where time clocks are used, employees who

---

[1] *See* Complaint at ¶ 42.C.

voluntarily come in before their regular starting time or remain after their closing time, do not have to be paid for such periods provided, of course, that they do not engage in any work. Their early or late clock punching may be disregarded."). Thus, Defendant does not have a policy or practice, equally applicable to all opt-in Plaintiffs that violates the law, as required for collective action. Instead, this case is about the allegation by some Plaintiffs that despite a lawful policy, they have made, on occasion, an individual choice to work "outside the buzzer."[2]

Plaintiffs' claims vary wildly even among the 17 who were deposed. At least two Plaintiffs admit they did not work before the buzzer, but want to be paid for donning and doffing maintenance uniforms. Some Plaintiffs claim all time from punch to punch is compensable "work" even as they admitted their definition of "work" includes walking to the time clock or waiting in line at the time clock. At least one Plaintiff claims she worked even before clocking in. No Plaintiff deposed could point to any facts to establish liability as to all Plaintiffs.

Whether Defendant is liable to any individual Plaintiff for uncompensated overtime depends on an individualized inquiry as to (1) whether any individual Plaintiff worked outside the buzzer, either before or after the shift, (2) to what extent (because it could be *de minimis*), (3) whether Defendant was aware the Plaintiff did so (because no liability without suffering or permitting employees to work), and (4) finally whether that work outside the buzzer resulted in any uncompensated overtime. Because *liability* (not just damages) to *any* Plaintiff depends on this Plaintiff testifying about these four issues, and the Defendant's individualized defenses to each specific claim, this case is not appropriate for collective action status and should be decertified.

---

[2] Undersigned will use "outside the buzzer" in general to refer to the alleged work between clocking in some time after 6:45 and the shift start of 7:00 am or between shift end (3:30) and clocking out (sometime before 3:45). It is not really "off the clock" because the Plaintiff was clocked in for any alleged work in that time before or after their shift.

## FACTUAL BACKGROUND AND SUMMARY OF ARGUMENT

At its Fayetteville manufacturing facility, Defendant makes copper tubing from raw copper in its mill.  The copper tubing is stretched to create various diameters; then cut to short lengths so those pieces can be made into elbows or t-shaped plumbing fittings. Those materials are carried by truck to the Westville, Oklahoma facility for packaging, storage, and shipment.

Some Plaintiffs worked in the mill operating the smelter to melt copper. They work in teams on 12 hour shifts. One Plaintiff in the mill runs a machine to test the copper tubing for defects prior to sending it to saw operators who cut it to length. Another was a saw operator.  A few are leads who were, at least for some time period during the statutory period, were paid to come in before the usual shift start. Other employees run forklifts to get the cut pieces to the machines where they make parts. Several work in maintenance.  One Plaintiff drives the truck between Fayetteville and Westville.

Plaintiffs work in two geographic locations, in two distinct operations, for many different supervisors, in different departments, performing different duties.  Some claim to have worked both before and after the buzzer; some only one or the other.  For most, whether they did any work outside the buzzer depended on the circumstances of the day. Some testified they knew their supervisors knew they were working outside the buzzer. Some speculated their supervisor knew. Some admitted their supervisor was not aware. Several Plaintiffs testified they could not tell how often they might have worked outside the buzzer or how much overtime liability that might equate to.  Defendant's factual and legal defenses will be unique to each Plaintiff both as to liability and damages.

The only way to determine liability for any alleged work outside the buzzer will "require significant analysis and factual determination individual to each Plaintiff."  *See* Order (granting

3

motion to decertify), *Melgar v. OK Foods*, Case No. 2:23-CV-02169, USDC Western District of Arkansas (April 29, 2016). The present case, like *Melgar,* will require a "large number of witnesses testifying only as to their own individual experiences with nothing to tie those experiences together." *Id.* at p. 6. For example, most Plaintiffs deposed testified they could not identify who else may have worked outside the buzzer and who have not. Some acknowledged the "coffee club,"-- employees who clock in and stay in the break room drinking coffee until the 7 am buzzer, a practice fully in line with the company's policies and procedures. *See, e.g.,* Deposition of Teri Borquin, at 19, attached to Motion as **Exhibit B**, hereinafter Borquin Dep.[3] Some noted the "long liners"--employees who line up at the time clock before the 3:30 PM buzzer, a practice tolerated by the company. For example, Teri Borquin testified there was no policy regarding end of day. Some people were lined up to clock out at 3:30 and some others continued to work. She testified whether someone was clocked out at 3:30 would depend on the situation and how much they care about their job. Borquin Dep. at 20-21. None could identify individual employees in either group (coffee club or long liner), however, except a couple maintenance employees who admitted to being in the coffee club. Whether "long liners" or not, several Plaintiffs testified they did not work past 3:30 and clocked out very close to shift end.

Thus, the only way to determine if any Plaintiff fit in one or both of those categories of employees who could not, by logic, be working outside the buzzer will require individualized inquiry. While Sheila McCoy declared she ran her machine to 3:30 and then had to clean up without pay, all but one other deponent testified cleanup is built into the daily schedule, with some machines shutting down as early as 3:00 pm, a full 30 minutes before shift end, to allow time for

---

[3] While Borquin later testified employees were supposed to have their machines warmed up by the start of the shift, she also admitted that there were employees who were not at their machines at the start of the shift who were not disciplined. Borquin Dep. at 36.

cleanup.  *See, e.g.,* Deposition of Jerry McChristian, at 55:11 to 56:12 attached to Motion as **Exhibit C**, hereinafter McChristian Dep..[4]

As this Court stated in *Melgar*, "Plaintiffs have not shown that any one of them could rely on the testimony of the others to demonstrate liability in his own case." *Id*. Thus, this case should not proceed to trial as a collective action.

If it did, the Court would have to hear from near 100 witnesses and "would then essentially be asked to decide which set of witnesses is more credible as a whole and would be given a likely impossible task of finding--based on…weeks…of testimony-how much time" if any, each Plaintiff spent working outside the buzzer, if their supervisor knew about it and whether that time (as found by the Court) resulted in unpaid overtime. *Id.* Here, the task would be even more difficult because, while there may be fewer witnesses than in *Melgar*, the issue is not how much time a reasonable person would spend on donning and doffing, but how much time, *if any*, any one Plaintiff spent working outside the buzzer and the corollary issues just mentioned. "The impractability of this proposed approach erases any practical benefits of allowing the case to proceed as a collective action." *Id.*

### DISCUSSION AND AUTHORITY

**I.     THE LENIENT STANDARD FOR CONDITIONAL CERTIFICATION FOR NOTICE PURPOSES NOW GIVES WAY TO A MORE SEARCHING INQUIRY**

This Court utilized the familiar, two-stage approach when it conditionally certified the collective action for notice purposes. [Doc. 27, pp. 3-4].  Under this approach, the burden is "relatively low." *Id.*  At the decertification stage, however, after discovery is largely complete, the inquiry is more searching.

---

[4] *See also* Deposition of David Patrick Wilder at 14-15 (all work, including cleaning was supposed to be done by 3:30), attached to Motion as **Exhibit D**; hereinafter Wilder Dep.,

FEC\46863\0001\8688687.v1-8/17/21

> **At this stage, the court has much more information on which to base its decision, and makes a factual determination on the similarly situated question. If the claimants are similarly situated, the district court allows the representative action to proceed to trial. If the claimants are not similarly situated, the district court decertifies the class, and the opt-in plaintiffs are dismissed without prejudice.** The class representatives – *i.e.* the original plaintiffs – proceed to trial on their individual claims.

*Mooney v. Aramco Services Co.*, 54 F.3d 1207, 1213-14 (5th Cir. 1995) (internal footnote omitted) (emphasis added).

Plaintiffs must make a stronger showing, when compared to conditional certification, to proceed with a collective action. *Wright v. Pulaski Cnty.*, 2010 WL 3328015, at *9 (E.D. Ark. Aug. 24, 2010); *Parler v. KFC Corp.*, 529 F. Supp. 2d 1009, 1011 (D. Minn. 2008) (internal citation omitted) ("If plaintiffs cannot make this stronger showing at the second stage, the conditionally certified class is decertified."). "Although courts typically grant conditional certification, that certification is 'by no means final.'" *White v. Baptist Mem. Health Care Corp.*, 2011 WL 1883959, at *3 (W.D. Tenn. May 17, 2011), *aff'd*, 699 F.3d 869 (6th Cir. 2012) (citing *Comer v. Walmart Stores, Inc.*, 454 F .3d 544, 547 (6th Cir. 2006)). During this second stage, courts—applying this stricter standard—make a factual determination as to whether the Plaintiffs are similarly situated. *Freeman v. Wal-Mart Stores, Inc.*, 256 F. Supp. 941, 945 (W.D. Ark. 2003); *see also King v. West Corp.*, 2006 WL 118577, at *13 (D. Neb. Jan 13, 2006); *Wright*, 2010 WL 3328015 at *9 (at the decertification stage, "the named plaintiffs must make a stronger showing to proceed on a collective basis."); s*ee also White*, 2011 WL 1883959, at *4 (plaintiff's burden); *Freeman*, 256 F. Supp. at 945; *King*, 2006 WL 118577, at *13.

Plaintiffs may be similarly situated when they "suffer from a single, FLSA-violating policy, and when proof of that policy or of conduct in conformity with that policy proves a violation as to all the [P]laintiffs." *Bouaphakeo v. Tyson Foods, Inc.*, 765 F.3d 791, 796 (8th Cir. 2014) (quoting *O'Brien v. Ed Donnelly Enters., Inc.*, 575 F.3d 567, 585 (6th Cir. 2009)).

6

Plaintiffs must establish liability on a class-wide basis to maintain a collective action based on such a common policy, plan or decision. *Briggins v. Elwood Tri., Inc.*, 882 F.Supp.2d 1256, 1267 (N.D. Al. 2012). That is not the case here.

To determine whether the Plaintiffs are similarly situated, courts typically analyze: (1) the disparate factual and employment settings of the individual plaintiffs; (2) the various defenses available to defendant which appear to be individual to each plaintiff; [and] (3) fairness and procedural considerations. *Bouaphakeo*, 765 F.3d at 796 (citing *Thiessen v. General Elec. Capital Corp.*, 267 F.3d 1095, 1103 (10th Cir. 2001) (ADEA claim)); *see also Smith vs. Heartland Auto. Servs., Inc.*, 404 F. Supp. 2d 1144, 1149 (D. Minn. 2005) (decertifying collection action, despite some similarity between employees). All three of these factors weigh in favor of decertification here.

In granting decertification, one court stated:

> The court agrees that this collective action would be unmanageable because "this case is fraught with questions requiring distinct proof as to individual plaintiffs." *Bayles v. Am. Med. Response of Colo., Inc.,* 950 F.Supp. at 1067. "Indeed, a collective action is designed to permit the presentation of evidence regarding certain representative plaintiffs that will serve as evidence for the class as a whole. It is oxymoronic to use [the collective action] device in a case where proof regarding each individual plaintiff is required to show liability." *Id.; see also Lusardi,* 122 F.R.D. at 466 (sheer number of witnesses that would be required to prove individual issues unmanageable).

*Gatewood v. Koch Foods of Mississippi, LLC,* 2009 WL 8642001, at *20 (S.D. Miss. Oct. 20, 2009). Every observation in this quote applies with equal force to the case at bar.

Courts considering factually analogous "long punch" cases in production settings have found such issues are not suitable for trial as a collective action because:

> [O]ff-the-clock work was not inherent in [the employer's] pay practices. The distinction between a compensation system that structurally results in unpaid overtime as opposed to one that pressures some plaintiffs to work off the clock is significant, because the extent to which plaintiffs worked off the clock—and

whether such work even occurred—varies materially among the class.
*Briggins v. Elwood Tri., Inc.*, 882 F. Supp. 2d 1256, 1258 (N.D. Ala. 2012).  That reasoning likewise demands decertification here.

*Briggins* involved a conditionally-certified collective action comprised of production line employees in a plant that manufactures parts for Honda.  *Id*.  As in this case, the production employees were permitted to clock in prior to the shift start, but were paid according to their shift's standard start and end times.  *Id*. at 1261.  As in this case, the employer's policies and pay practices complied with the FLSA and its implementing regulations, and there could only be a violation— and, therefore, create liability—where an individual employee alleged the employer had strayed from its otherwise legal practices.  The Court acknowledged there would have been some instances of unpaid overtime within the class, but unpaid overtime was not an inherent in the defendant's system.  The *Briggins* court determined that in order to present the matter without prejudicing the defendant, individual inquiries would be required for each plaintiff.  *Id.* at 1267.  The result was the matter was not appropriate for class adjudication.  The present case is no different.

Certification requires a common question that can be answered to determine liability as to all plaintiffs which is not present here. Each employee's claim will require an individualized inquiry which requires decertification.   In *Wright*, the Eastern District of Arkansas decertified a FLSA class of detention facility employees because "plaintiffs' individual experiences . . . vary from shift to shift and day to day" so that "resolution of Plaintiffs' claims will involve consideration of personalized evidence and require significant individualized inquiry." 2010 WL 3328015, at *9.  The *Wright* Court reasoned that "resolution of each claim for overtime will require an individualized, fact-based analysis" and held that "members of the conditionally certified class are not similarly situated as required under § 216(b)." *Id.* at *10. There, Judge

8

Susan Webber Wright noted, "Without question, resolution of Plaintiffs' claims will involve consideration of personalized evidence and require significant individualized inquiry" and, therefore, "the interests of justice would not be served by attempting to adjudicate Plaintiffs' claims collectively." *Id*.

Likewise, the case before this Court is fraught with questions requiring distinct proof as to individual Plaintiffs. The collective action provisions of the FLSA we not designed or intended to simply try 66 individual cases *in seriatim*. There is no representative testimony that will establish liability for all the Plaintiffs. Thus, decertification is only proper.

II.   **UNDER THE APPROPRIATE ANALYSIS AT THE DECERTIFICATION STAGE, THE ONLY APPROPRIATE FINDING IS THE PLAINTIFFS' CLAIMS CANNOT BE TRIED AS A COLLECTIVE ACTION BECAUSE PLAINTIFFS ARE NOT SIMILARLY SITUATED**

   A.   **McCoy is not a proper lead Plaintiff, and her claims are not representative of the conditionally-certified class.**

      i.   *Lead Plaintiff's Complaint is Different than Her Testimony, and Even her Declaration*

First, Sheila McCoy alleges in her Complaint that no matter how many hours she worked, she was only paid for 40. [Doc. 2, ¶ 28]. She alleged "upon information and belief", other hourly employees were adjusted to reflect only forty hours worked per week. [Doc. 2, ¶¶29-30] She is wrong. *See, e.g.,* Deposition of Hugh "Bud" Walker at 10:12-18 attached to the Motion as **Exhibit E**; hereinafter Walker Dep. Even McCoy admitted when she worked overtime (as reflected on her timecard prior to the COVID pandemic); she was paid overtime. Deposition of Shiela McCoy at 9, 20 ("We stopped the overtime [after COVID];" "We didn't pull all the overtime [after COVID]"), attached to the Motion as **Exhibit F**, hereinafter McCoy Dep. That seems dispositive of the issue of whether there is a common question of denying overtime when it is clear employees are working and being paid for a fair amount of overtime.

Second, McCoy's Complaint says her "duties *sometimes* required her to clock in before 7:00 AM or clock out after 3:30 PM." [Doc. 2, ¶ 26] (emphasis added).  She claimed in her declaration that her "duties *regularly* required [her] to clock in before 7:00 AM or clock out after 3:30 PM.  For example, [she] *always* had to clean [her] equipment after my shift ended at 3:30 PM…." [Doc. 18-7, ¶ 12] (emphasis added).  In discovery, however, she admitted her "***normal*** work schedule," was, "Before Covid: 5:00 a.m. - 3:30 p.m., after Covid: 7:00 - 3:30." *See* McCoy Resps.to DF's First Set of Interrogatories and Requests for Production attached to Motion as **Exhibit G** at Int. No. 6 (emphasis added).  In her deposition, she admitted the normal schedule before COVID, was to clock in at 5:00. McCoy Dep. at 15.    Moreover, she admitted her supervisor's instructions were only to be at her machine by shift start (5 am or 7 am). McCoy Dep. at 22.

Other deponents confirmed the rule. *See, e.g.,* Deposition of Anna Corsby Dep. at 8 attached to Motion as **Exhibit H**, hereinafter Corsby Dep.; Wilder Dep. at 11-12. Wilder said he did not make a habit of starting early. *Id.* at 12.  When asked about her affidavit testimony that she saw others worked prior to the shift start, Corsby said, "I honestly don't know." Corsby Dep. pp. 26-27. Corsby also testified, she did not pay attention to anyone else. *Id*. at 21.

      ii.    *Lead Plaintiff's Claims are Different than those of Other Plaintiffs*

Other employees did not have the same experience or even the same claims as McCoy or other Plaintiffs.  For example, the first two deponents were Dan Williams and Hugh "Bud" Walker.  Both men worked in maintenance, not operations like McCoy. Neither worked prior to shift start, as McCoy claimed. Williams Dep. at 36:12-20, attached to Motion as **Exhibit I,** hereinafter Wms. Dep. ; Walker Dep. at 16:17-17:9.  Both were part of the "coffee club"—employees who clock in and then go drink coffee and/or eat breakfast in the breakroom until the 7:00 AM buzzer.  Wms.

Dep. at 10:23-11:8; 12:19-12:25; Walker Dep. at 12:3-22.    Walker also stated in response to Defendant's written discovery requests that his "normal work hours" began at 7:00am Monday through Friday.[5]  *See* Walker Resps. to DF's First Set of Interrogatories and Requests for Production attached to Motion as **Exhibit J** at Int. No. 6.  Nonetheless, both claimed the Company owed them for "work" before 7:00 AM, arguing their "work" was donning their uniform after they clock in, but before 7 am. Wms. Dep. at 22:12-23:2; Walker Dep. at 27:19 to 28:5; 38:11-18. Walker admitted his claim was entirely different than McCoy's. Walker Dep. at 28:9-14. McCoy did not even wear a uniform.  McCoy Dep at 11.  This is not a donning and doffing case, but Walker signed up because the notice said he might be entitled to money. Walker Dep. at 28:18 to 30:14.

Williams did claim he sometimes worked between 3:30 and 3:40 PM.  Wms. Dep. at 41:17-42:14. He admitted, however, that it takes about 15 minutes to clean up and change clothes after stopping work and that he cleaned up and changed clothes *before* clocking out in the afternoon. Wms. Dep. at 24:22-25:9. Thus, his own testimony undermines his claim to be working between 3:30 and his clock out at some time (somewhere between 3:30 and 3:45), and seems more in line with his claim he should be paid to change clothes.  In any event, he admitted he would not know how to determine if he actually stopped work at 3:30 or a few minutes after.  Wms. Dep. at 24:23-26:23.

For his part, Walker admitted he was changing clothes between 3:30 and 3:45, but also claimed the company owed him for that time. Walker Dep. 37:8 to 38:10.  Both men were adamant they should be paid for donning and doffing ordinary maintenance uniforms.  See Wms. Dep. 22:12 to 23:2.  Specifically, Walker testified as follows:

---

[5] Williams did not provide responses to Defendant's written discovery requests.

| | |
|---|---|
| Q. | You're here because you think you should be paid for putting on your uniform? |
| A. | I do, sir. |
| Q. | And, again, fair, fair.  I don't think that's a legal requirement, but you are certainly entitled to that opinion.  Is there any way else that the company has failed to pay you for the hours that you believe are, quote/unquote, work hours? |
| A. | No, sir.  That's why I joined that suit for, because that was the only one I had. |

Walker Dep. 31:15-25

When questioned about possibly working (not just changing out of his uniform) after 3:30, Williams said the company "backtrack[s] our time from 3:40 back to 3:30. Wms. Dep. 24:13-17. But when questioned if or how often it could have happened that he actually worked between the buzzer and clocking out near 3:45 resulting in uncompensated hours, Williams could not say. Wms. Dep. 25:13 to 26:23 & 27:6-9. But he did admit "most, most of the time" he's finishing up "pretty close to 3:30." Wms. Dep. 26:20-23. To be clear, a maintenance employee could work beyond 3:30 on occasion; work for which they were paid.  For example, they could have been in the middle of a machine repair and did not want to leave it for the second shift. Wms. Dep. at 26:24 to 28:5. In that case, however, when an employee clocks out beyond 3:45, he is paid for every minute beyond 3:30. Wms. Dep. at 42:12-14; see also the Declaration of Mike Shepherd, attached to Motion as **Exhibit A.**

Because Williams and Walker work all over the plant, they could observe production employees working outside the buzzer if it was happening. Williams said he was not aware of any production employees working outside the buzzers. Wms. Dep. at 31:17-22.  In fact, he testified contrary to McCoy's declaration, but consistent with other deponents who were asked[6], that cleanup was built into the production schedule for machine and saw operators. Wms.  Dep. at

---

[6] *See, e.g.*, Corsby Dep. at 15-16, 26; Wilder Dep. at 14-15; McChristian Dep. at 13:1-3; 14:3-6.

12

38:25-40:7. Thus, for example, a saw operator would stop sawing so he could be ready to go at 3:30.  Wms. Dep. at 39:8 – 40:1. Walker did say there always *seemed* to be someone sweeping the floor after 3:30, but he also admitted there were employees at the time clocks even before 3:30. Walker Dep. at 40:6-10; 42:22-25.  Anna Corsby admitted the shift ended at 3:30 each day and "everyone" was in line to clock out at the end of the shift. Corsby Dep. at 15, 32-33. She testified she clocked out at 3:30 every day and jogged to her car to get out of there. *Id*. at 16, 26. Thus, to determine which Plaintiffs chose to work for some few minutes between 3:30 and 3:45 will require individualized proof. In sum, the claims of Williams and Walker are not the same as McCoy's. Their testimony establishes that any liability for working outside the buzzer depends on the Court making a factual finding that an individual Plaintiff worked outside the buzzer in light of the evidence that at least some employees are in the break room until 7:00 in the morning and at least some employees are at the time clock before the 3:30 quitting time.

## B.  Disparate Factual and Employment Settings and Unique Defenses Render Plaintiffs Dissimilar

The Company's policy of allowing employees to clock in or out within 15 minutes of their shift start or end complies with the FLSA.  The only potential violation of the Act is if any individual Plaintiff works outside the buzzer, that work is not *de minimis*, the employer "suffered or permitted" the work, and the work resulted in uncompensated overtime in a particular week. This disparate factual and employment setting means the Plaintiffs are not similarly situated with respect to their potential claims.  Each claim will require an individualized inquiry as to each of these elements.

For example, Hector Garcia, testified that while he was an operator, he clocked in and went to work immediately because his "work ethic is different than other people's work ethic." *See* Deposition of Hector Garcia at 60:12-21, attached to Motion as **Exhibit K**, hereinafter Garcia Dep.

The individual employee's choice and work ethic is the same explanation given by hourly lead Teri Borquin as to why she and some others worked before the scheduled start of the shift – not a policy or practice of Elkhart.  Borquin Dep. at 18.

As to end of day, Garcia claimed he worked after 3:30 without pay only because he was made a team lead. Garcia Dep. at 29:4-19.  Garcia admitted, however, his supervisor told him if he had to work beyond 3:30, to wait until 3:45 to clock out so that he'd be paid for the work and then some. *Id*. at 45:13-22; 48:2-16. Garcia ignored this directive, however, speculating that *if* he did work past 3:30, he would not wait until 3:45.  He further admitted his supervisor would be unaware that he failed to follow instructions.  *Id.* p. at 101:23-102:5.  Again, the potential legal liability is not in the policy, but the failure of the Plaintiff to follow the policy.

As a lead, it was Garcia's job to make sure everyone was clocked out close to 3:30.  Garcia Dep. at 35:9-19.  He acknowledged that "for the most part, every person that was in my department was already in line to get clocked out at 3:30…" but if they weren't, "Then that was their call." *Id.* Thus, again the only way to determine liability for actual work after 3:30 is individualized inquiry.

Teri Borquin, another hourly lead, claims she worked outside the buzzer not because of some policy, but because she felt it was her responsibility as a lead. Borquin Dep. at 32-33.  This would not apply to non-lead Plaintiffs. Moreover, she also claims she began working *before* she clocked in, not simply before shift start. *Id.* at 7, 12-13. She claims sometimes she would clock in as early as 4:30 for a 5:00 am shift start. She admits that for at least part of the time, she was paid from her "early" clock in, however. *Id.* at 15-16. This second claim is further proof this case is inappropriate for collective action status.

Silmar Lemus has worked three positions in the Fayetteville plant--machine operator, wastewater technician, and tube tester in the tube mill.  Deposition of Silmar Lemus at 7:6-25;

14

26:7-8 attached to Motion as **Exhibit L**, hereinafter Lemus Dep.. He was not trained to start working before the buzzer and his supervisors did not ask him to. Lemus Dep. at 11:18-12:8 & 19:5-11. Thus, it is not the policy, but a breach that creates potential liability. He testified that as an operator he would go to his machine and wait for the buzzer, *unless* the third shift operator needed help, or if he need to get parts to be ready at 7 am. *Id.* at 12:4-13:22. But if the machine was running correctly and the parts hopper was full, he would sometimes just wait till shift start. *Id*. at 19:5 to 19:23. He said his supervisor would be aware because he would see him working. *Id.* at 18:24-19:4. Thus, his claim and defense here require a highly individualized inquiry. For example, how often did the third shift operators need help? How often were there not enough parts to get started at 7 am and wait for the material handlers to reload his stock of raw materials, if ever? Did his supervisor actually see him working early? What do his timecards show about his clock time in relation to his shift start time?

Lemus did not claim to work past 3:30, however. Lemus Dep. at 25:15 to 26:6.

In his wastewater job and tube mill tester job, Lemus claims he started eight minutes early each day. Lemus Dep. at 28:20 to 29:11. In these several jobs, he had at least five supervisors. *Id.* at 16:6 to 17:15. All will have to testify about his claims and the company's defenses to them. None of this testimony is relevant to any other Plaintiff.

Chris Keck has worked in four positions—machine operator, material handler (forklift driver), shipping and receiving, and then as a driver. Deposition of Christopher Keck at 6:20-22, attached to Motion as **Exhibit M**, hereinafter Keck Dep. He's had two supervisors. Keck Dep. at 6:23 to 7:7. He alleges when he was hired in 2014, a supervisor named Hector told him to get paperwork, prep work done to be ready to start running parts at the buzzer. *Id.* at 8:17-22. This claim will require testimony of the supervisor and third shift operator who preceded Keck.

In mid-2017, Keck became a material handler. In that position, he claims he would check his forklift before his shift.  Keck Dep. at 10:3-23. His supervisor was Carl Pizzano. *Id*. at. 11:17-18. Keck assumed Pizzano knew he checked the forklift before 7 am, even though Pizzano did not ask him to and Keck "can't verify yes or no" that Pizzano was aware he was working outside the buzzer. *Id*. at 12:18-13:4.

When Keck moved to driving the truck between Fayetteville and Westville, he claims he would do his safety walk around and do his paperwork between clock in and shift start. Keck Dep. at 14:17-22. He claims Pizzano knew because they talked about it. *Id.* at 15:10-16.  In shipping and receiving, he claimed that between his clock in and shift start, he'd check emails or get "caught up on anything that was, needs to be done first thing this morning."  *Id*. 17:6-10.  He speculated Pizzano knew he worked early simply because Pizzano saw him clock in and log in.  *Id.* at 17:11-18. Pizzano will have to testify regarding his knowledge of this alleged pre-shift work in either position.  In any event, Keck doesn't know if any of this alleged pre-shift or post-shift work resulted in unpaid overtime. *Id*. at 24:13-22; 43:12-22.

Even after the company reiterated in September 2020, that employees were supposed to wait till shift start to begin work, Keck claims he chose to disobey this rule because, "There's not enough time in the day to get everything done." Keck Dep. at 17:24 to 19:22. This proves any FLSA violation depends on the employee not following the rule, and this case is not appropriate for resolution via collective action.

Keck's claims are different than other Plaintiffs. He claims he should be paid punch to punch because walking to and from the time clock is "work."  Keck Dep. 22:8-20. He is also under the misimpression that no matter when he clocks out, it rounds back to the nearest quarter hour.

*Id.* at 31:6-32:1. That is simply not the case, but it illustrates the futility in trying these claims together.

Defendant also has a unique defense to Keck's overtime claim as it relates to driving the box truck between Arkansas and Oklahoma. He drove the truck with a GVWR of 18,000 in interstate commerce. Keck Dep. at 14:12-16. Thus, while he was in this position he is exempt from the FLSA under the Motor Carrier Exemption. *See* 29 U.S.C., 213(b)(1)

Finally, Keck's may be the best testimony in support of decertification. When asked about which production workers he would observe working beyond 3:30, he said, "It just depends on certain days of who it was." On any given day it could be a different, "it's just randomized." Keck Dep. at 39:16-40:2.

Jerry Dean DeMoss is a current maintenance electrician. Deposition of Jerry Dean DeMoss at 7:22-23, attached to Motion as **Exhibit N**, hereinafter DeMoss Dep. He worked as a forklift driver for about three months after he was hired in August 2019. DeMoss Dep. at 7:16-17 His production supervisor was Carl Pizzano and his maintenance supervisors have been Jacob Bonet and Jeff Magyer. *Id.* at 7:24-8:12.

His testimony is likewise illustrative of the internal inconsistencies of a Plaintiff's testimony and its inconsistencies with that of other Plaintiffs. More importantly, it is illustrative of the fact decertification is proper. For example, he admitted he was told during orientation to clock in fifteen minutes before work and to be ready to work at 7:00 am. DeMoss Dep. at 8:25-9:5. He nonetheless chose to do his visual inspection of the forklift in the few minutes before the shift started. *Id*. at 10:3-8. DeMoss admitted he had no idea whether his then-supervisor, Carl Pizzano, knew he was doing this inspection before the buzzer. *Id*. at 11:17-21.

FEC\46863\0001\8688687.v1-8/17/21

DeMoss also testified he followed the buzzer.  DeMoss Dep. at 12:2-8. More importantly, he testified, "I can't say I have done any work that I didn't get paid for." *Id*. at 26:6-12.  His complaint was that when he went from forklift driver to maintenance, he was told he would be paid $22/hour, but only received $18. He admitted he knew participating in this suit would not redress that alleged wrong. *Id*. at 26:13-24. He is not claiming work between clock in and shift start or from shift end to clock out. *Id*. at 27:7-22.  That is all this case is about, but he testified he opted in, not because he was denied overtime, but because an employee named James Newman, (who is not a Plaintiff) was.  *Id*. at 29:15 to 30:23 ("And, matter of fact, he is the reason I signed the paper." 30:10-11) DeMoss admitted, however, that he doesn't know if Newman is paid for that work. *Id.* at 32:18-20.

In other testimony, DeMoss said, "I don't believe I'm entitled to anything.  Why I signed it was some people had been talking and said that if enough people sign that piece of paper, they were going to make sure that Elkhart was fair from now on, and that's all I cared about.  I don't feel wronged at all."  Demoss Dep. at 25:8-13.

When questioned by his own counsel, DeMoss claimed to have worked in production and in maintenance prior to 7 am and said "if" he was owed money, he wanted to be paid for it. DeMoss Dep. at 37:2-38:14.  He admitted however he did not know *if* any of this alleged unpaid work resulted in unpaid overtime, the only claim in this collective action.  *Id*. at 38:19-39:1.   As explained above, he also did not know if his production supervisor, Pizzano, even knew he was working.

While in maintenance, DeMoss was told employees were not paid until 7:00 AM (the rule). DeMoss Dep. at 17:7-11.  He admitted maintenance employees start the day with a 7:00 AM department meeting and that they don't have any work order tickets to work before 7:00 AM. *Id*.

at 19:1-20:5.   DeMoss's end of day routine in maintenance was that he would be "shooting for" having his tools cleaned up by 3:30 so he could head out at 3:30, but he could get "hung up" with the second shift.  *Id.* at 22:12-23:4.  He testified at the end of the day, we would pass off to second shift, change clothes, shoes, wash hands. *Id.* at 20:25-21:4.  He claimed he believed he should get paid to wash up. *Id.* at 21:21-24. This is not the law and it is not a claim made in McCoy's Complaint.  He also said he personally believed he should be paid "punch to punch." *Id.* at 31:15-20. This is not the law either.

Jerry McChristian was hired as a maintenance employee in 1974, but in the time relevant here, he was an hourly maintenance lead. McChristian Dep. at 8:16-21. His supervisors were Chris Davis and then Jacob Bonet. *Id.* at 9:17-10:13.  He admitted the rule was you could clock in up to fifteen minute early because there were a lot of people trying to clock in close to 7 am. *Id.* at 13:12 to 14:9. As the lead, however, he claimed to clock in and go to work to get ready for the 7:00 am maintenance meeting. That entailed turning on the computer and getting the work orders ready, prioritizing the work orders, and retrieving parts from the tool crib that he assumed they would need to make repairs that day. *Id.* at 14:10-15:23, 24:18-25:9, 37:9-15. He admitted that during the statutory period applicable to his claim, a supervisor was there before 7 am as well. *Id.* at 19:15 to 20:3. Thus, those supervisors will be necessary to testify that they did the work McChristian claimed to do.  His claim and the defenses thereto can only be adjudicated by individualized scrutiny, not applicable to any other Plaintiff.

McChristian's claim is also fundamentally different from others because he claims to have occasionally worked before he punched in if the supervisor on the third shift supervisor needed something or were "having problems." McChristian Dep. at 30:14-31:9.  He admitted this was not an every-day occurrence, and could not identify who that third shift supervisor could have been.

FEC\46863\0001\8688687.v1-8/17/21

*Id*. McChristian could not say whether or not he was paid.  *Id*. at 32:18-21, 33:10-11. Thus, this claim and defense will also require a highly individualized inquiry, rendering his claim inappropriate for group resolution.

As to whether and how much other maintenance employees worked before the buzzer, McChristian could only speculate that as they made their way from the time clocks in their areas throughout the plant, they *could be* stopped by a production employee to help with something simple.  McChristian Dep. at 73:23 to 74:13. He speculated that if it's a small job they may do it before 7:00. That would be *de minimis*.  In any event, it shows that to establish liability for any maintenance employee, that employee will have to testify and Defendant will be required to put on testimony unique to that Plaintiff in the form of his time sheets, work orders, and testimony by the production employees he allegedly helped prior to 7:00 am, etc.

McChristian admitted he had no evidence he worked between 3:30 and 3:45 and was not paid. McChristian Dep. at 51:1-5; 63:21 to 64:12.  He further admitted no one else would have such evidence that he worked in the afternoon outside the buzzer. *Id.*

> i.   *Jason Turner's claims (and the defenses thereto) are Different Than McCoy's and Other Plaintiffs*

The second factor courts consider in determining whether Plaintiff are similarly situated is the various defenses to Plaintiff's claims.  As established above, the factual and legal defenses to each claim will depend on individualized testimony and exhibits applicable to only that Plaintiff, such as whether they were a member of the "coffee club" or the "long liners"; whether and when they even say they worked outside the buzzer; whether their supervisor knew and whether that work resulted in unpaid overtime.

Jason Turner, another maintenance employee, and McCoy's roommate for a time while she worked there, contends the company owes him from punch to punch, even if he is simply waiting

20

at the time clock between 3:30 and his punch out time. Deposition of Jason Turner Dep. at 7, 24-25, 50, attached to Motion as **Exhibit** O, hereinafter Turner Dep.[7]   Turner argues, "If I'm held up at the time clock for an extra ten minutes, yes, I should be paid for that extra ten minutes, because that's ten minutes taken from my life, my family, my time. My time is what I'm here getting paid for. So if they're taking up my time, yes, I want compensation."   Turner Dep. 47:3-11. Of course, that is not the law, but it does reveal another reason why this case cannot be tried as a collective action--the claims are different and the facts establishing liability and damages are unique to each Plaintiff.

Turner claimed his "work" at the end of the day could be simply walking to or waiting at the time clock, but that he was "probably" cleaning tools and locking up. Turner Dep. at 29:15-21; pp. 32-34.  Yet, he could not say whether his supervisor knew whether he was doing actual work beyond 3:30.  *Id*. at 66:11-15("I don't know what my supervisor knows. You would have to ask him that.")  On the one occasion that he was sure his supervisor knew he was working past 3:30, welding the atmospheric generator, he claims he did not get paid. *Id*. at 69:17 to 70:24. But plant manager, Mike Shepherd, has testified via affidavit with exhibits that he indeed was paid for the work that day. *See* Labor Analysis Report attached as Exhibit 2 to Shepherd Declaration**.**  Even so, this shows the claims and defenses for each Plaintiff are different.

As to the beginning of his day, Turner testified he may have worked, tacking on a bolt or nut on a guard, for example, between clock in and 7 am "probably five, six times, nothing."  Turner Dep. at 42:7-10; 43:4-19.  Moreover, he did not know if that few minutes on those few occasions would have resulted in unpaid overtime. *Id*. at 42:17-24. He mostly clocked in, unlocked his personal tool box and picked up his work orders at the maintenance department's 7:00 am shift

---

[7] Turner admitted that the only time an employee could work outside the buzzer and not get paid was if he did actual work between 3:30 and 3:45 and clocked out by 3:45. Turner Dep. 29:7-14.

meeting. *Id*. 51:11-19.  The testimony from the company will be that when he brought up the issue in September 2020, he admitted he did not work before the shift started, but was only bringing up the issue because he did not agree that his end time could be adjusted to 3:30 each day if his clock out time were later (regardless of what he was doing between 3:30 and clock out). *See* Shepherd Declaration; Turner Dep. at 8:10-13.

Turner's case is different for one final reason.  When he brought up the issue about "rounding" back to 3:30 PM, the company paid him for the difference between his clock out time and the 3:30 shift end, because that is what he was claiming at the time. *See* Declaration of Mike Shepherd (explaining Turner was paid straight time and overtime for what he would be owed if the company owed him for all time between shift end and clock out).  Thus, Turner's case is different because the Company's defense to his claim is, in part, that he has been paid for any potential overtime.[8]

### III.   FAIRNESS AND PROCEDURAL CONSIDERATIONS DICTATE THIS CASE BE DECERTIFIED

The United States District Court for the Western District of Wisconsin *sua sponte* decertified an FLSA and collective action because of the class members' "divergent testimony, distinct theories of liability and unique employment environments and experiences."  *Espenscheid v. DirectSat USA, LLC*, 2011 WL 2009967, at *5 (W.D. Wis. May 23, 2011), *amended,* 2011 WL 2132975 (W.D. Wis. May 27, 2011) and *aff'd*, 705 F.3d 770 (7th Cir. 2013).  The court reasoned that "the evidence in the case suggests that proof of plaintiffs' claims depends on how individual

---

[8] Turner disputes that he was paid the correct amount, arguing that the Company added the payment to a check where he had earned overtime thus resulting in a "higher tax bracket." Turner Dep. at 18-19; 61.  Of course, that is not the law. Companies do not change the rate of taxes for withholding from check to check. That is determined by what the employee puts on their W4 form and their tax rate is determined at the time they file their tax return based on annual income.

technicians responded to the numerous policies and practices at issue in the case." *Id.* at *5. The

court in *Espenscheid* summarized its decision by stating:

> the evidence in this case reveals substantial variations among the
> opt-in plaintiffs and class members. At a high level of generality,
> the opt-in plaintiffs and class members perform similar job duties
> and are subject to the same corporate policies. But in terms of
> individual experiences, the evidence shows that opt-in plaintiffs
> and class members have different work experiences and were
> affected by defendants' policies in different ways.

*Id.* at *7; *see also Lugo v. Farmer's Pride Inc.*, 737 F. Supp. 2d 291, 303 (E.D. Pa. 2010) (finding

"that any such undercompensation was not suffered on a collective basis—i.e., according to a

'single decision, policy or plan' applicable to all plaintiffs—but rather that defendant's policies

and practices impacted individual plaintiffs in individual ways.").   This is exactly the case here.

Plaintiffs did not identify any experts by the June 4, 2021 deadline, and did not move for

class certification of the AMWA claim by March 31, 2021. *Id.*   Seventy-three Plaintiffs opted

in.  During discovery, seven opted out, leaving 66 Plaintiffs.  No one Plaintiff, or even a few, can

establish liability as to the collective.  Thus, trial would require all 66 Plaintiffs to testify and for

Defendant to present witnesses (supervisors, managers, and non-Plaintiff hourly production

employees) to rebut those claims and establish legal and factual defenses to each Plaintiff's

claims. Defendant has identified 25 witnesses in response to discovery and could likely call more

in rebuttal to specific factual allegations made by any given Plaintiff, especially those who have

not been deposed.   At the end of 91 or more witnesses testifying, the Court will be asked to

determine liability and damages to 66 individual Plaintiffs who are not similarly situated.

Even if "just" 66 cases, it would be unfair for Defendant to be expected to defend against

all the disparate theories and factual circumstances of all these current and former employees by

having to prepare for 66 mini-trials.  *See Melgar, supra*, at slip. Op. p. 6.  Further, conducting

such a trial would be procedurally unwieldy. *Id.*

**CONCLUSION**

Liability as to any Plaintiff's claim depends on a multitude of data points unique to that Plaintiff. For example, did that particular Plaintiff work outside the buzzer at all? Was it in the morning or afternoon? Why? Who knew? How long? Did the employee work beyond 3:45, such that she would be paid for every minute in that instance? Did the employee work before being clocked in at all? Did the supervisor requesting the employee work before clocking in correctly record the employee's time?  Did any alleged uncompensated time result in unpaid overtime? Each claim will require detailed, individualized proof as to the nature and the amount of the work and the factual and legal defenses of that particular Plaintiff's claims.  There is no common policy, plan or decision from the Defendant that resulted in class wide liability for overtime compensation.  For all the reasons set out above, the Court should decertify the collective and dismiss all the opt-in Plaintiffs without prejudice.

Respectfully submitted,
Daniel L. Herrington (ABA# 95166)
Friday, Eldredge & Clark, LLP
2000 Regions Center
400 West Capitol Avenue
Little Rock, AR 72201-3493
501-370-1571
501-244-5382 Fax
Herrington@fridayfirm.com

FEC\46863\0001\8688687.v1-8/17/21